## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**TIMOTHY SHANNON**                          **CIVIL ACTION**

**VERSUS**                                   **NO. 22-1222**

**RODI MARINE, LLC, ET AL.**                 **SECTION: D (5)**

## ORDER AND REASONS

Before the Court is a Motion For Summary Judgment, filed by defendant, Talos Oil and Gas, LLC ("Talos").[1]  Plaintiff, Timothy Shannon, opposes the Motion,[2] and Talos has filed a Reply.[3]  After careful consideration of the parties' memoranda and the applicable law, the Motion is **DENIED.**

## I.    FACTUAL AND PROCEDURAL BACKGROUND

This maritime personal injury case involves claims by Timothy Shannon that he was injured on May 5, 2021 while being transported to an offshore oil production platform owned and/or operated by Talos Oil and Gas, LLC ("Talos") via an offshore supply vessel owned and operated by Rodi Marine, LLC ("Rodi Marine").[4]  Shannon alleges that he was employed by Helmerich & Payne, Inc. as a rig manager for the drilling rig known as the H&P rig 100, and that he was assigned to perform work as a rig manager on Talos' production platform located south of Terrebonne and/or Lafourche Parish, Louisiana.[5]  Shannon alleges that Talos entered into a time charter agreement with Rodi Marine to provide transportation on the M/V MR LLOYD to and

---

[1] R. Doc. 50.
[2] R. Doc. 55.
[3] R. Doc. 73.
[4] R. Doc. 1 at ¶¶ 4-6.  In its Motion, Talos refers to its platform as "the GC-18 platform."  R. Doc. 50-14 at pp. 2-3.
[5] R. Doc. 1 at ¶ 4.

from the Talos production platform.[6]  Shannon asserts that the weather conditions offshore were poor at the time of the incident, and that during the voyage to the platform, the M/V MR LLOYD encountered "especially rough seas while operating at an unsafe speed, thereby causing Plaintiff to be unexpectedly thrown about, and resulting in Plaintiff sustaining injuries to his neck, back and hip, among other parts of his body."[7]

On May 4, 2022, Shannon filed a Complaint for Damages in this Court against Rodi Marine and Talos, asserting claims against Rodi Marine and Talos under the Longshore and Harbor Workers' Compensation Act and general maritime law.[8] Pertinent to the instant Motion, Shannon alleges that Talos was negligent for, among other things, failing to provide safe transportation to the production platform, permitting transportation to the production platform in rough seas, and ordering, as time charterer, the M/V MR LLOYD out in rough seas and creating a dangerous and unsafe condition.[9]

In the instant Motion, Talos asserts that it is entitled to summary judgment because it had no control over the operation and navigation of the vessel under its time charter agreement with Rodi Marine.[10]  The time charter agreement provides, in pertinent part, that, "in the performance of any Work for [Talos], [Rodi] conclusively shall be deemed an independent contractor, with the authority and right

---

[6] *Id*. at ¶ 7.
[7] *Id*. at ¶¶ 8-9.
[8] *Id*. at ¶¶ 2, 10-11.
[9] *Id*. at ¶ 11.
[10] R. Doc. 50.

to direct and control all of the details of the Work, [Talos] being interested only in the result obtained . . . ."[11]  Talos argues that under its time charter agreement, Rodi Marine retained control over all aspects of vessel management and navigation of the M/V MR LLOYD and was responsible for manning, operating, and navigating the vessel, including determining the suitability of weather and sea conditions for the conduct of the vessel operations on May 5, 2021.[12]  Relying upon the testimony of Howard Jordan, the captain of the M/V MR LLOYD at the time of the voyage, Talos asserts that it is undisputed that Talos did not order Captain Jordan to make the voyage.[13]  Talos further asserts that it is entitled to summary judgment because it owed no legal duty to Plaintiff to prevent Captain Jordan from making the voyage.[14] Talos argues that the opinions of Plaintiff's marine safety expert, Captain Gregg Daley, regarding the duties that Talos owed to Plaintiff as a time charterer should be rejected as inadmissible legal conclusions, opinions that are pure *ipse dixit*, and unsupported by the evidence of record.[15]

Plaintiff opposes the Motion, asserting that, as time charterer of the M/V MR LLOYD, Talos owed "a hybrid duty arising from contract and tort to persons with whom it has no contractual relationship, including vessel passengers, to avoid negligent actions within the sphere of activity over which it exercise[d] at least partial

---

[11] R. Doc. 50-14 at p. 3 (*quoting* R. Doc. 50-1 at ¶ 7).
[12] R. Doc. 50-14 at pp. 1, 3, 9, & 11-13.
[13] *Id*. at pp. 1-2, 6, 9, & 14-16 (*citing* R. Doc. 50-1 at ¶¶ 29-30, 33).
[14] R. Doc. 50-14 at pp. 2, 9-10, & 16-19.
[15] *Id*. at pp. 16-22.

control."[16]   Plaintiff claims that, traditionally, time charterers maintain at least partial control over "choosing the vessel's cargo, route, and general mission, *as well as the specific time in which the vessel will perform its assignment*."[17]  Plaintiff asserts that, even if a time charterer contracts away the control it traditionally maintains over the timing of a vessel's mission, a plaintiff can show the time charterer owed a duty by introducing evidence that the time charterer's conduct "was more broadly exercised or inconsistent with the terms of the charter agreement."[18]  Plaintiff argues that Talos did much more than involve itself in the timing and means of the subject crew change, as Captain Jordan testified that it was "their [Talos'] discretion whether we ran out or in."[19]   Plaintiff also points to the testimony of Chad Graham and Christopher Rawson, Talos' well site leaders on the platform at the time of the incident, who testified that it was their responsibility to delay crew changes or request helicopters if the waves are projected to be too rough.[20]  As such, Plaintiff contends that Talos exercised control over the timing and means by which crew changes for the platform took place.[21]  Plaintiff further asserts that Talos was negligent in directing and/or dispatching the M/V MR LLOYD into dangerous sea conditions, since Talos had multiple forecasts predicting wave heights higher than

---

[16] R. Doc. 55 at pp. 1 & 9 (quoting *Hodgen v. Forest Oil Corp.*, 87 F.3d 1512, 1520 (5th Cir. 1996), superseded by statute on other grounds as recognized in *Grand Isle Shipyard, Inc. v. Seacor Marine, LLC*, 589 F.3d 778 (5th Cir. 2009) (en banc)) (internal quotation marks omitted).
[17] R. Doc. 55 at p. 9 (quoting *Hodgen*, 87 F.3d at 1520) (internal quotation marks omitted) (emphasis added by Plaintiff).
[18] R. Doc. 55 at pp. 9-10 (quoting *Callahan v. Gulf Logistics, LLC*, 456 Fed.Appx. 385, 391 (5th Cir. 2011)) (internal quotation marks omitted).
[19] R. Doc. 55 at p. 10 (*quoting* R. Doc. 55-11 at p. 9).
[20] R. Doc. 55 at pp. 10-12 (*quoting* R. Docs. 55-5 at pp. 7-8, 9-10 & 55-6 at p. 8).
[21] R. Doc. 55 at pp. 3 & 15.

eight feet, a height deemed by Talos as too rough for a crew change by boat.[22]  Plaintiff contends that Talos could have, and should have, prevented the underlying voyage by delaying the crew change for a few hours or by conducting it via helicopter.[23]

In response, Talos maintains that it had no duty to control the timing of the crew change and that it remains undisputed that Captain Jordan alone decided to make the voyage because he thought it was safe to do so.[24]  Talos asserts that Plaintiff has misrepresented the testimony given by Graham and Rawson because they testified that they had the authority to instruct a vessel not to make a trip to the platform to load or offload passengers and cargo if it was predicted to be too rough *at the platform* to do so safely.[25]  Talos claims that Plaintiff is misrepresenting the evidence in an attempt to conflate Talos' right to direct the commercial activity of the vessel with Talos' purported duty to exercise operational control over a vessel if seas were forecasted to reach a certain wave height.[26]  Talos maintains that all decisions concerning the navigation and operation of the vessel, including the decision to begin and continue the voyage under the prevailing weather and sea conditions, remained, by contract, with Rodi Marine.[27]  Talos further asserts that Plaintiff's reliance upon two Fifth Circuit cases, *Callahan* and *Hodgen*, is misplaced since those cases concerned plaintiffs who were injured while transferring from a vessel to a production

---

[22] R. Doc. 55 at pp. 17-20 (*citing* R. Doc. 55-7 at pp. 48-51; R. Doc. 55-8 at p. 82; R. Doc. 55-5 at pp. 9-10; R. Doc. 55-6 at pp. 7-8, 15-16, & 19).
[23] R. Doc. 55 at pp. 22-24.
[24] R. Doc. 73 at p. 1 (citing *Callahan v. Gulf Logistics, LLC*, 456 Fed.Appx. 385 (5th Cir. 2011)).
[25] R. Doc. 73 at p. 2 (*quoting* R. Doc. 73-1 at p. 7; R. Doc. 73-2 at pp. 7-10) (quotation marks omitted).
[26] R. Doc. 73 at p. 2.  *See, Id*. at p. 1.
[27] *Id*. at p. 3.

platform and Plaintiff had no problem disembarking from the M/V MR LLOYD.[28] Talos maintains that a time charterer may be held liable for its independent negligence in dispatching a vessel offshore in inclement weather conditions only if "it forces the vessel under charter out in hurricane weather or similar treacherous conditions," and that it is undisputed in this case that Talos did not order Captain Jordan to make the voyage.[29]

## II.   LEGAL STANDARD

### A. Summary Judgment Standard

Summary judgment is appropriate where there is no genuine disputed issue as to any material fact, and the moving party is entitled to judgment as a matter of law.[30] A party moving for summary judgment must inform the Court of the basis for the motion and identify those portions of the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, that show that there is no such genuine issue of material fact.[31] If the moving party carries its burden of proof under Rule 56, the opposing party must direct the Court's attention to specific evidence in the record which demonstrates that the non-moving party can satisfy a reasonable jury that it is entitled to a verdict in its favor.[32] This burden is

---

[28] *Id.* at pp. 5-8 (citing *Callahan,* 456 Fed.Appx. 385; *Hodgen v. Forest Oil Corp.*, 87 F.3d 1512 (5th Cir. 1996)).

[29] R. Doc. 73 at p. 10 (citing *Graham v. Milky Way Barge, Inc.*, 824 F.2d 376 (5th Cir. 1987); *Matter of P & E Boat Rentals, Inc.*, 872 F.2d 642, 647 (5th Cir. 1989); *Helaire v. Mobil Oil Co.*, 709 F.2d 1031, 1041-42 (5th Cir. 1983); *Offshore Logistics Services, Inc. v. Mut. Marine Office, Inc.*, 462 F. Supp. 485, 490 (E.D. La. 1978); *Randall v. Chevron U.S.A. Inc.*, 13 F.3d 888, 900 (5th Cir. 1994)).

[30] Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10, 91 L.Ed.2d 202 (1986).

[31] *Celotex Corp.*, 477 U.S. at 322, 106 S.Ct. at 2552.

[32] *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510.

not satisfied by some metaphysical doubt as to alleged material facts, by unsworn and unsubstantiated assertions, by conclusory allegations, or by a mere scintilla of evidence.[33]  Rather, Rule 56 mandates that summary judgment be entered against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial.[34]  In resolving a motion for summary judgment, the Court must review the facts and inferences in the light most favorable to the non-moving party, and the Court may not evaluate the credibility of witnesses, weigh the evidence, or resolve factual disputes.[35]

## III.   ANALYSIS

### A. The Talos-Rodi Marine Time Charter Agreement.

The Fifth Circuit has held that, "A time charterer owes a hybrid duty arising from contract and tort to persons including vessel passengers, to avoid negligent activity within 'the sphere of activity over which it exercises at least partial control.'"[36]  The traditional spheres of activity over which time charterer's exercise control "include, *inter alia*, choosing the vessel's general mission and the specific time in which it will perform the mission."[37]  According to the Fifth Circuit, the vessel owner and time charterer may, by contract, vary the traditional assignment of control. [38]   "[U]nless the parties have so varied the traditional allocation of

---

[33] *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).
[34] *Celotex Corp.*, 477 U.S. at 323, 106 S.Ct. at 2552.
[35] *International Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263 (5th Cir. 1991).
[36] *Callahan v. Gulf Logistics, LLC*, 456 Fed.Appx. 385, 390 (5th Cir. 2011) (quoting *Hodgen v. Forest Oil Corp.*, 87 F.3d 1512, 1520 (5th Cir. 1996)).
[37] *Callahan*, 456 Fed.Appx. at 390 (citing *Hodgen*, 87 F.3d at 1520).
[38] *Callahan*, 456 Fed.Appx. at 390 (citing *Hodgen*, 87 F.3d at 1520).

responsibility, a time charterer owes no duty beyond these spheres."[39]  The Fifth

Circuit has also clarified that:

> [T]he fact that a vessel may owe a duty to a third party over a certain
> sphere of activity does not necessarily mean that this duty is exclusive.
> Thus, the fact that a vessel owes a duty to a passenger to provide a safe
> means of ingress and egress does not mean that an accident arising from
> this activity cannot also be the fault of the time charterer, if the plaintiff
> can establish that accident resulted in part from a decision, such as the
> timing of the ingress or egress, within the time charterer's control
> spheres.[40]

This last principle "is particularly relevant to the question of a time charterer's

liability,"[41] since "the modern approach to such situations is to impose a duty upon

both parties having control over the events causing an accident and to translate

previous principles of primary and secondary fault into findings on comparative

negligence."[42]

Relying upon its time charter agreement with Rodi Marine, Talos argues that

it had no control over the M/V MR LLOYD or the timing of the voyage at issue, that

it did not order the vessel to leave the dock on the day that Plaintiff was allegedly

injured, and that Rodi Marine was responsible for manning, operating, and

navigating the vessel.[43]  Talos asserts that it merely time-chartered the M/V MR

LLOYD to transport cargo, equipment, and passengers between the shore and its

---

[39] *Hodgen*, 87 F.3d at 1520.

[40] *Id.*

[41] *Rich v. Bud's Boat Rental, Inc.*, Civ. A. No. 96-3279, 1997 WL 543093, at *3 (E.D. La. Sept. 3, 1997) (Vance, J.) (citing *Hodgen*, 87 F.3d at 1520).

[42] *Hodgen*, 87 F.3d at 1521.

[43] R. Doc. 50 at p. 1; R. Doc. 50-14 at p. 1; R. Doc. 73 at p. 1.

platform.[44]  The Talos-Rodi Marine time charter agreement provides the following:

> 5. Subject to paragraph 6 below, (a) in the performance of any Work for Company, Contractor conclusively shall be deemed an independent contractor, with the authority and right to direct and control all of the details of the Work, Company being interested only in the result obtained, but all Work contemplated shall meet the approval of Company and shall be subject to Company's general right of inspection; (b) the employees, agents and representatives of Contractor at all times shall be under the direct and sole supervision and control of Contractor and (c) no relationship of master and servant or of principal and agent shall exist between Company on the one hand and Contractor or any employee, agent or representative of Contractor on the other hand.[45]

The Court agrees with Talos that the plain text of the agreement contains no language indicating that Talos had control over the operation or navigation of the M/V MR LLOYD.  In *Callahan v. Gulf Logistics, LLC,* the Fifth Circuit construed language similar to the first sentence of Talos' time charter agreement (stating that Talos is only interested in the result obtained) as removing from the time charterer "any control over the means by which its desired results were obtained."[46]  The Fifth Circuit held that the time charterer in that case had "maintained an interest in the 'results obtained,' but the timing of [plaintiff's] transfer to the *Ocean Spartan* falls squarely in the realm of means, over which [the time charterer] disavowed all control."[47]  The Fifth Circuit in *Callahan* further found that the time charterer had "ratified the vessel captain's exclusive right to determine the safety of a voyage" based on the fact that the time charter agreement provided that the time charterer shall

---

[44] R. Doc. 50-14 at pp. 2-3 (*citing* R. Doc. 50-1 at ¶ 5); R. Doc. 73 at p. 2 (*citing* R. Doc. 50-4 at ¶¶ 3-5).
[45] R. Doc. 50-4 at p. 4.
[46] *Callahan v. Gulf Logistics, LLC*, 456 Fed.Appx. 385, 391 (5th Cir. 2011).
[47] *Callahan*, 456 Fed.Appx. at 391.  The Court notes that unlike the crew change involved in the instant case, the "transfer" at issue in *Callahan* was a personnel basket transfer from a crew boat to a mobile drilling rig.  *Id*. at 387-88.

have "the right to designate the voyages to be undertaken and the services each vessel is to perform, subject always to the sole right of [C & G Boats] or the captain of each vessel to determine whether the movement may be safely undertaken, with the captain always being in charge."[48]  According to the Fifth Circuit, "That LLOG reserved a 'right to designate the voyages to be undertaken,' refers, in context, only to its designation of the general mission of the vessel but not to operational matters such as the *timing* of personnel transfers."[49]  Relying upon this authority, the Court finds that the time charter agreement, on its face, did not impose a duty upon Talos to avoid negligent actions with respect to the means or timing of the crew change during which Plaintiff was purportedly injured.

That determination does not end the analysis.

---

[48] *Callahan*, 456 Fed.Appx. at 391.

[49] *Id.* (emphasis in original).  The Court observes that in *Hodgen v. Forest Oil Corp.*, the Fifth Circuit held that, with respect to the transfer of passengers from a boat to a platform via personnel basket:

> What made this transfer dangerous was Doucet's timing; on that particular morning, the seas were seven to nine feet.  The timing of the transfer was in Doucet's control in his capacity as the agent of the time charterer of the MISS DEBORAH.  *Nothing in the time charterer* [sic] *in this case altered the traditional allocation of control over the timing of the mission to the time charterer.*  Doucet's contractual control over the timing of the MISS DEBORAH's mission gave rise to the hybrid *Graham* duty to choose the moment of the transfer reasonably.  Doucet breached this duty.  The fact that the vessel captain may also have labored under an independent duty to stop the transfer, a proposition no one disputes in this case, did not prevent the *Graham* hybrid duty from arising.

87 F.3d 1512, 1521 (5th Cir. 1996) (emphasis added).  It is unclear to the Court whether *Hodgen* conflicts with the *Callahan* court's conclusion that the timing of a personnel transfer is an operational matter, as the Court was unable to locate the language of the time charter agreement at issue in *Hodgen* in either the lower court or appellate decision.  *See, Hodgen*, 87 F.3d 1512; *Hodgen v. Forest Oil Corp*, 862 F. Supp. 1552 (W.D. La. 1994).  The Fifth Circuit in *Hodgen* merely stated that the time charterer had "chartered the M/V MISS DEBORAH in a non-demise fashion from the vessel's owners and operators," and noted that, "In a 'non-demise' charter, the owner of the ship remains in control of the vessel and provides the crew."  *Hodgen*, 87 F.3d at 1515 & n.1 (citing *Forrester v. Ocean Marine Indem. Co.*, 11 F.3d 1213, 1215 (5th Cir. 1993)).

**B. Plaintiff has raised a genuine issue of material fact regarding whether Talos exercised control over the timing and the means by which a crew change is accomplished.**

While the time charter agreement does not impose a duty upon Talos with respect to the timing or means of accomplishing a crew change, that does not end the inquiry. The Court must also consider whether Plaintiff has provided any evidence that Talos' conduct as a time charterer "was more broadly exercised or inconsistent with the terms of the charter agreement."[50] The Court finds that Plaintiff has submitted such evidence, through the deposition testimony of Chad Graham and Christopher Rawson, Talos' site leaders on the platform at the time of the incident, who testified that Talos has control over both the timing and the means by which a crew change occurs. Graham and Rawson testified that they, along with other Talos employees, create seven-day planners for Talos that show when equipment and personnel will arrive at the platform.[51] Talos employees Graham and Rawson also testified that they monitor the weather about two days before a crew change and if the forecast shows that there will be rough seas, there will be internal discussions at Talos to determine whether the crew change should be delayed or if it should be made by helicopter instead.[52] Graham testified that if the forecast shows waves between eight and twelve feet or waves that are "up around ten footers, yes, we normally try to set up a helicopter flight two days prior to the crew change."[53] Rawson likewise

---

[50] *Callahan*, 456 Fed.Appx. at 391. *See, Menard v. LLOG Expl. Co., LLC*, 259 F. Supp. 3d 475, 483 (E.D. La. 2017) (citing *Callahan*, 456 Fed.Appx. at 391) ("Further, plaintiff submits no evidence that LLOG's conduct as a charterer was 'more broadly exercise or inconsistent with the terms of the charter agreement' in relation to the personnel transfer.").
[51] R. Doc. 55-5 at pp. 4-6; R. Doc. 55-6 at pp. 3-6.
[52] R. Doc. 55-5 at pp. 7-10; R. Doc. 55-6 at pp. 7-11.
[53] R. Doc. 55-5 at p. 10.

testified that he considered "rough seas" as "eight foot and above" for personnel and equipment.[54]

As Plaintiff points out in his Opposition brief, Graham and Rawson both testified that Talos exercises partial control over the timing of a crew change and whether it will occur via vessel or helicopter.[55]  Plaintiff has provided a portion of Graham's deposition testimony, which contains the following exchange with Plaintiff's counsel:

> Q. All right.  And so Talos has control over a situation to where it could say no, it's not safe to do a vessel, we're ordering a helicopter, correct?
> A. Yes and vice versa.
> Q. Okay.  We talked about boat versus helicopter.  Same question.  You'd agree that at a minimum, Talos has partial control of whether the boat brings people to H&P 100?
> A. Yes.
> Q. Okay.  And when it brings them there?
> A. Whenever they're set up to come out, that's right.
> Q. Yeah.  But Talos has control of when they're set to come out?  That's what I'm asking.
> A. Well, they - - they give us the list of names of who's coming out.  We make sure that they're on the manifest, right.
> Q. Right.
> A. And they have a set date crew change.
>
> . . . .
>
> Q. Okay.  And so we talked earlier about it, but I just want to make sure I'm clear.  Talos controls when the boat brings people and cargo, correct?
>     Mr. Malish: Object to the form.
>     The Witness: Talos controls whether or not they bring out the people - -
> Mr. Marcelle: When? I'm sorry.
> A. - - or when.

---

Q. When?
A. Yeah.[56]

Rawson similarly testified that when Talos is considering making any changes based on the weather forecasts, Mike Boudreaux, another Talos employee in charge of logistics,[57] makes the "final call" on whether to use a helicopter instead of a vessel for a crew change.[58]  Captain Jordan likewise testified during his deposition that, "if 100 thinks that it's too rough, they'll tell us to hold off on running out there, or if they think it's too rough.  Because it wasn't - - it was mainly HP 100.  It was their discretion of whether we ran out or in."[59]  Captain Jordan further testified that, "So we would call them or they'd call us and say, hey, just hold off for a little while, let's see if it calms down or if it's too rough or see if you can make it.  If you can't, turn around, give us a call, let us know if you're not coming . . . ."[60]

The portion of Graham's deposition transcript submitted by Talos likewise shows that Talos exercised control of the timing and the means of a crew change involving the M/V MR LLOYD.  Throughout his deposition, Graham seemed to testify that the decision to postpone a voyage due to rough seas or to use a helicopter instead of the M/V MR LLOYD is left to the boat captain.[61]  Graham, however, also testified several times that Talos has significant input in those decisions.  When asked if he could delay the vessel based on a weather forecast, Graham stated, "If I need to."[62]

---

[56] R. Doc. 55-5 at pp. 13-14.
[57] *Id.* at pp. 5-6
[58] R. Doc. 55-6 at pp. 7-11.
[59] R. Doc. 55-11 at p. 9.  Captain Jordan's reference to "HP 100" appears to be a reference to the "H&P Rig 100," owned by Talos.  *Id.* at pp. 6 & 8.
[60] *Id.* at p. 9.
[61] R. Doc. 50-2 at pp. 4-5, 9-10, 15-16, & 17-18; R. Doc. 55-5 at pp. 11, 15, 17, & 21-22.
[62] R. Doc. 50-2 at p. 10.

Graham similarly testified that if the vessel captain advised Talos that there were 12' or 15' seas, Talos has the authority to tell the captain to cancel or postpone the voyage.[63]  When asked whether there have been times that, "you guys at Talos on the rig, have told the captain, hey, I think it's too rough, hold off?," Graham testified, "That's correct."[64]  Similarly, when Graham was asked whether Talos has input in the decision to postpone a crew change, he testified, "I mean, yeah, if we want to hold off on something, yeah, we can hold off."[65]  When Graham was asked whether Talos has at least partial control over the decision whether the vessel sails in rough seas, he testified, "If we do not want that boat to come out, yes, we have the right to tell him to stay at the dock.  That's for sure.  If we want that boat to come out, we expect him to come out."[66]

Talos does not address the foregoing evidence in its Reply brief except to assert that Plaintiff has misrepresented the testimony in an attempt to conflate Talos' right to direct the commercial activity of the vessel with Rodi Marine's obligation to control the timing of the voyage due to weather and see conditions.[67]  The Court rejects Talos' arguments as completely baseless.  The Court has reviewed the deposition testimony submitted by both parties and finds that it raises a genuine dispute regarding whether Talos exercised control over the timing and means of the crew change during which Plaintiff was allegedly injured.   The Court further finds that several

---

[63] *Id*. at p. 12.
[64] *Id*. at p. 13.
[65] *Id*. at p. 14.
[66] *Id*. at p. 19.
[67] R. Doc. 73 at pp. 1-2.

representations made by Talos in its Reply brief support this finding. For instance, Talos asserts that, "Captain Pinder testified that on one occasion, he was on board M/V MR. LLOYD and *Talos instructed the captain* to turn the boat around and return to the dock because *Talos decided to use a helicopter to transport personnel from shore to the platform.*"[68] Talos also asserts that, "Captain Pinder testified that there was one occasion where Talos instructed him not to make a voyage to the platform because the conditions at the platform were too rough to safely unload cargo and passengers." [69] This testimony directly contradicts Talos' assertion that, "All decisions concerning navigation and operation of the vessel, *including the decision to begin and continue the Voyage under the prevailing weather and sea conditions*, remained, by contract, with Rodi."[70]

Talos further asserts in its Reply brief that, "Plaintiff's mischaracterization of the testimony of Graham and Rawson is even more deceptive when considering the undisputed evidence that the weather and sea conditions at GC-18 on the morning of May 5, 2021, were perfectly safe to offload cargo and personnel from the vessel onto the rig."[71] According to Talos, Graham testified that the weather forecast predicted wave heights of four to six feet at the platform when the vessel was scheduled to arrive on May 5, 2021.[72] Talos then asserts that, "These predicted 4'-6' sea conditions at the platform did not warrant *Graham delaying the Voyage, cancelling the Voyage,*

---

[68] R. Doc. 73 at p. 3 (*citing* R. Doc. 73-4 at pp. 5-6).
[69] R. Doc. 73 at p. 4 (citing R. Doc. 73-4 at pp. 8-9).
[70] R. Doc. 73 at p. 3.
[71] *Id.* at p. 4.
[72] *Id.* (*citing* R. Doc. 73-2 at pp. 14-21).

*or ordering a helicopter to transport Plaintiff* and the rest of the HP crew from Fourchon to the rig on that date."[73]  Talos seems to overlook its own admission here that Talos, through its employees, exercises control over the timing and means of crew changes, including the voyage during which Plaintiff was allegedly injured.  By way of one example, Talos provided additional excerpts from the deposition testimony of Talos employee, Chad Graham, in which Graham was asked, "Okay, There are times that the H&P 100, that is you guys at Talos on the rig, have told the captain, hey, I think it's too rough, hold off?"  Graham's response was, "That's correct."[74]  Graham was then asked, "Okay.  We just in the last lines we reviewed, agreed and established that you guys can tell him to postpone.  My point is it's a collaborative process.  Talos has input in this decision, correct?"  Graham answered, "I mean, yeah, if we want to hold off on something, yeah, we can hold off."[75]  Graham further testified, "Okay.  If we do not want that boat to come out, yes, we have the right to tell him [the boat captain] to stay at the dock.  That's for sure.  If we want that boat to come out, we expect him to come out.  If he comes out and he says it's too rough, and turns around, and gets back to the dock.  He says, 'Hey, it's too rough.'  We respect that too."[76]  The Court therefore finds such cases as *Callahan* and *Menard* distinguishable because, unlike in this case, the time charter agreements in those cases specifically gave the captain of the vessel the sole right "to determine whether the movement may be safely undertaken, with the captain always being in charge"

---

[73] R. Doc. 73 at p. 4 (emphasis added).
[74] R. Doc. 73-2 at p. 12.
[75] *Id.* at p. 13.
[76] *Id.* at p. 24.

and there was no evidence in those cases that the time charterer's conduct "was more broadly exercised or inconsistent with the terms of the charter agreement."[77]  The Court finds that the evidence of record, and Talos' own representations, raise a disputed issue of fact regarding Talos' operational control over the M/V MR LLOYD, including the timing and means of the crew change during which Plaintiff was allegedly injured, which is material to Plaintiff's claims.

### C. Plaintiff has raised a genuine issue of material fact regarding whether Talos was negligent in failing to postpone the crew change or in failing to conduct the crew change via helicopter.

The Court further finds that there exists a genuine dispute of material fact regarding whether Talos was negligent in failing to delay the crew change or in failing to use a helicopter to make the crew change in light of the weather forecasts for the time of the voyage.  Talos asserts that the weather forecasts predicted four to six foot seas in the area between the shore and the platform, and that nothing in the forecasts gave Captain Jordan cause for concern before he departed the dock just after midnight on May 5, 2021.[78]  Talos claims that Captain Jordan testified that the M/V MR LLOYD encountered wave heights of only three to four feet during the voyage at issue.[79]  Talos further asserts that Plaintiff's liability expert, Captain Gregg Daley, similarly opined that the M/V MR LLOYD encountered four to six foot seas during the voyage.[80]  Talos argues that the weather and sea conditions were usual for that

---

[77] *See, Callahan v. Gulf Logistics, LLC*, 456 Fed.Appx. 385, 391 (5th Cir. 2011); *Menard v. LLOG Expl. Co., LLC*, 259 F. Supp. 3d 475, 482-83 (E.D. La. 2017) (citing *Callahan*, 456 Fed.Appx. at 391).

[78] R. Doc. 50-14 at pp. 5-6 (*citing* R. Doc. 50-1 at ¶¶ 23-26 (*citing* R. Doc. 50-6 at pp. 5-13; R. Doc. 50-12 at p. 5; R. Doc. 50-5 at p. 11)).

[79] R. Doc. 50-14 at p. 6 (*citing* R. Doc. 50-1 at ¶ 35 (*citing* R. Doc. 50-5 at pp. 6 & 7; R. Doc. 50-11)).

[80] R. Doc. 50-14 at p. 7 (*citing* 50-1 at ¶ 41 (*citing* R. Doc. 50-13 at pp. 51 & 57)).

time of year,[81] and that the Fifth Circuit has held that seas of up to eight feet in the Gulf of Mexico are safe to perform vessel operations.[82]  Talos also relies on Rawson's deposition testimony, wherein Rawson confirmed that he has never delayed a voyage because of six-foot seas and explained, "That's kind of a [sic] average day in the Gulf, four to six-foot seas in the wintertime is an average day in the Gulf of Mexico."[83] Talos likewise points out that Graham testified that the weather forecast for the time of the voyage predicted wave heights of four to six feet, which did not warrant delaying or cancelling the voyage or ordering a helicopter to transport Plaintiff and the rest of the crew that night.[84]

Plaintiff, however, has produced evidence indicating that on the evening of May 4, 2021, Talos was in possession of weather forecasts predicting wave heights of six to nine feet.  Specifically, Plaintiff produced an email from WeatherOps Marine Forecaster, with the subject line "[EXTERNAL] Gulf of Mexico Logistics – Talos Energy – Gulf of Mexico – May 4, 2021 – 1800 LT," that appears to predict wave heights of six to nine feet at 6:00 p.m. on May 4, 2021 and wave heights of four to six feet at 6:00 a.m. on May 5, 2021.[85]  Plaintiff has also produced evidence indicating that Talos received an email from WeatherOps Marine Forecaster on May 4, 2021 with the subject line, "[EXTERNAL] Marine Daily Planner – Talos Energy – Gulf of Mexico – May 4, 2021 – 1800 LT," that appears to predict a maximum wave height of

---

[81] R. Doc. 50 at pp. 1-2.

[82] R. Doc. 50-14 at pp. 2 & 9 (citing *Tarlton v. Exxon*, 688 F.2d 973, 976-77 (5th Cir. 1982); *Hebron v. Union Oil Co. of Cal.*, 634 F.2d 245, 246 (5th Cir. 1981)).

[83] R. Doc. 50-3 at p. 3.

[84] R. Doc. 73 at p. 4 (*citing* R. Doc. 73-2 at pp. 14-21).

[85] R. Doc. 55 at p. 18 (*citing* R. Doc. 55-7 at pp. 7, 45-51); R. Doc. 55-7 at pp. 44-46.

12 feet at midnight on May 5, 2021, around the same time as the voyage at issue, and a maximum wave height of 10 feet at 6:00 a.m. on May 5, 2021.[86]

Plaintiff has also submitted a Coastal Waters Forecast issued by the National Weather Service at 10:44 p.m. on Tuesday, May 4, 2021 that appears to predict, "Seas 3 to 6 feet with occasional seas to 8 feet" for the evening of May 4, 2021.[87] As Plaintiff points out, the National Weather Service forecast states that, "Seas are provided as a range of the average height of the highest 1/3 of the waves . . . along with the occasional height of the average highest ten percent of the waves."[88] Plaintiff points out that the National Weather Center forecasts, including the forecast Captain Jordan claims to have received on the morning of May 4, 2021, states that, "individual waves may be more than twice the significant wave height."[89] Plaintiff further asserts that his expert, Captain Daley, has opined that the maximum wave height during the voyage was projected to be somewhere between twelve and eighteen feet.[90] Moreover, Plaintiff has submitted the deposition testimony of Graham and Rawson, the well site leaders on Talos' platform, who both stated that eight foot waves constitute "rough seas" that would warrant using a helicopter instead of a vessel for

---

[86] R. Doc. 55 at p. 18 (*citing* R. Doc. 55-7 at pp. 48-51); R. Doc. 55-7 at pp. 48-50.

[87] R. Doc. 55 at p. 19 (*citing* R. Doc. 55-8 at p. 82); R. Doc. 55-8 at pp. 78 & 82.

[88] R. Doc. 55 at p. 19 (*citing* R. Doc. 55-8 at p. 25); R. Doc. 55-8 at p. 78.

[89] R. Doc. 55 at p. 19 (*quoting* R. Doc. 55-13 at p. 5) (internal quotation marks omitted).

[90] R. Doc. 55 at p. 19. The Court notes that Plaintiff also asserts that Captain Daley has opined that it was unnecessarily dangerous and risky to dispatch the M/V MR LLOYD into the forecasted conditions. *Id.* at pp. 19-20. To the extent Captain Daley's opinions "concerning the supposed duties which Talos, as time charterer, owed to Plaintiff" are the subject of a pending Motion to Strike filed by Talos (R. Doc. 52), the Court will not consider his opinions on that topic. However, because Talos relies upon Captain Daley's opinion regarding the waves encountered by the M/V MR LLOYD in its own Motion (R. Doc. 50-14 at p. 7), the Court will consider his opinion regarding the wave heights in determining whether Talos is entitled to summary judgment.

the crew change.[91]  When asked about reading wave forecasts "in making a decision about whether or not the waves were high enough to call for a helicopter" and "wave heights that would concern you in order to call for a helicopter," Graham testified, "Well, I mean, you got your - - your in-between waves and your max wave.  You always go with the max wave."[92]  Plaintiff has also submitted deposition testimony of three other passengers that were on the M/V MR LLOYD when Plaintiff was allegedly injured, Christopher Walker,[93] Billy King,[94] and Thomas Nazary,[95] who testified that the seas were very rough that night, with Walker testifying that it felt like "10 to 12-foot seas" at times.[96]

Based upon the evidence before the Court, and viewing the facts and inferences in the light most favorable to Plaintiff as the non-moving party, the Court finds that a genuine dispute exists regarding whether Talos was negligent in failing to postpone the voyage during which Plaintiff was injured or in failing to conduct the crew change by helicopter.  There is conflicting evidence before the Court regarding the forecasted wave heights for the evening of May 4, 2021 prior to the voyage at issue, which began around midnight on May 5, 2021, varying from four to six feet to six to nine feet.  The evidence before the Court indicates that Talos made decisions regarding postponing, canceling, or conducting crew changes by helicopter based upon the maximum wave height forecasted, and that Talos would use a helicopter for a crew change if the waves

---

[91] R. Doc. 55-5 at pp. 9-10; R. Doc. 55-6 at pp. 15-16.
[92] R. Doc. 55-5 at pp. 11 & 12.
[93] R. Doc. 55-2.
[94] R. Doc. 55-3.
[95] R. Doc. 55-4.
[96] *See,* R. Doc. 55-2 at pp. 3-4 & 6; R. Doc. 55-3 at  pp. 4, 5, & 6;  R. Doc. 55-4 at pp. 3-4.

were predicted to be eight feet or above.  There is also evidence before the Court that the predicted maximum wave height was ten to thirteen feet between 6:00 p.m. on May 4, 2021 and 6:00 a.m. on May 5, 2021, with the waves declining over time.[97] Based on the evidence of record, the Court finds that Plaintiff has raised a genuine dispute regarding whether Talos was negligent in failing to postpone the crew change at issue or in failing to conduct the crew change via helicopter, and that this issue is dispositive to Plaintiff's claims against Talos.  Further, resolution of these factual disputes will likely require determinations of witness credibility, which the Court is not in a position to do at this juncture.  Accordingly, the Court finds that Talos is not entitled to summary judgment.

## IV.    CONCLUSION

For the foregoing reasons, **IT IS ORDERED** that the Motion For Summary Judgment, filed by Talos Oil and Gas, LLC[98] is **DENIED.**

New Orleans, Louisiana, February 22, 2024.

**WENDY B. VITTER**
**United States District Judge**

---

[97] R. Doc. 55-7 at p. 50.
[98] R. Doc. 50.